# United States Court of Appeals
## For the First Circuit

No. 01-2392

UNITED STATES OF AMERICA,

Appellee,

v.

CHAMOND HENDERSON, A/K/A "BUTTER,"

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U. S. District Judge]

Before

Selya, Circuit Judge,

Coffin and Bownes, Senior Circuit Judges.

John T. Ouderkirk, Jr., for appellant.
Peter K. Levitt, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief for
appellee.

February 14, 2003

**BOWNES, <u>Senior Circuit Judge</u>.** Defendant-appellant Chamond Henderson ("Henderson") appeals from a jury conviction on all five counts of an indictment charging him and two others. Count One charged Henderson, Robert Carey ("Carey") and Kimberly Powers ("Powers") with conspiring to possess with intent to distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 846.[1] Counts Two through Five charged Henderson and Powers with possessing crack cocaine with intent to distribute it and with distribution in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Carey was also charged in Count Five.

Henderson and Carey were tried jointly. Both were convicted and appealed separately. Carey's appeal is also before us and is the subject of a separate opinion. See <u>United States</u> v. <u>Carey</u>, No. 01-2439. Powers entered into a plea bargain with the government and testified at the trial.

## I. <u>THE EVIDENCE</u>

We recount the facts as the jury rationally could have found them, consistent with record support. In October 1998 the Drug Enforcement Administration ("DEA") began an investigation of crack cocaine trafficking in Worcester, Massachusetts. The DEA contacted a known crack cocaine user, Joseph Mozynski ("Mozynski"),

---

[1] Grams and ounces are used interchangeably throughout this opinion. It should be noted that one ounce equals 28.35 grams. <u>See</u> United States Sentencing Commission, <u>Guidelines Manual</u>, § 2D1.1, comments. (n.11) (Nov. 2002).

to serve as a cooperating witness in its investigation. Mozynski knew Henderson and had seen him once or twice before becoming a cooperating witness. Mozynski facilitated four purchases of crack cocaine from Henderson during the course of the investigation. Henderson and Mozynski were present at all four sales. Two of these four purchases were made in the basement of the apartment building in which Henderson lived, 27 Wachusett Street. The other sales took place within two blocks of Wachusett Street.

A. The First Sale

The sale occurred on October 19, 1998. It took place at 6 Denny Street in Worcester. Carey and Powers were living there at the time. Mozynski talked to Carey about wanting to buy crack cocaine and was told by Carey that he could get it from a person called "Butter." The deal was that Mozynski would pay $1,200 for 25 grams of crack cocaine. Carey was to get $200 for setting up the sale. It was agreed that Mozynski would pick up the crack cocaine at 6 Denny Street on October 19.

On that day, Mozynski met with DEA Special Agents Timothy Anderson and Robert Guerard. They searched him and then wired him with a concealed monitoring device, enabling the DEA to tape record the drug transactions, and gave him $1,200. The agents watched Mozynski enter 6 Denny Street. After he was inside the house, he was met by Powers, Carey, and a woman named Lynn Cappulett. Mozynski showed Powers the $1,200 and Powers told Carey to page

-3-

Butter. After speaking to Butter on the phone and telling him that Mozynski was here with the money, Powers told Mozynski that Butter would be there within five minutes. Agent Anderson videotaped Henderson walking down Denny Street and then turning into the driveway at 6 Denny Street. Mozynski gave Henderson the $1,200 and received from him a package. Mozynski and Henderson discussed future transactions, and Henderson told Mozynski to contact him only through Powers.

A short time after Mozynski had entered 6 Denny Street, Agent Anderson observed and videotaped him leaving the premises. Mozynski went straight to the DEA agents and gave them the package Henderson had given him. Mozynski also made a written statement describing the events that took place inside 6 Denny Street. As part of the statement, Mozynski described Henderson as five feet, ten inches tall, 175 or 180 pounds and of medium complexion. A couple of minutes later, Agent Anderson observed and videotaped Henderson leaving 6 Denny Street. A chemical analysis of the contents of the package given by Mozynski to the DEA agents showed that it contained 23.7 grams of crack cocaine.

B. The Second Sale

The second sale, which took place on October 27, 1998, was also a face-to-face purchase by Mozynski. Mozynski met Powers at 6 Denny Street to purchase three ounces of crack cocaine from Henderson. After leaving Denny Street, Mozynski and Powers met

Agent Guerard in the car he used for undercover work. Agent Guerard said he was a customer of Mozynski. Powers told Guerard to drive to a nearby location where Powers and Mozynski got out of the car. Mozynski and Powers met Henderson in the basement of Henderson's apartment building at 27 Wachusett Street. Mozynski paid Henderson $3,000 and was given a piece of newspaper containing a plastic bag. Mozynski then delivered the package to Agent Guerard, who searched him. The subsequent chemical analysis showed the substance in the plastic bag contained 73.2 grams of crack cocaine.

C. The Third Sale

The third sale took place on November 3, 1998. Mozynski contacted Powers prior to November 3. Powers told him to contact Butter directly by his pager, which he did. Butter returned the page; they talked over the phone and agreed to another drug sale using the same format as the prior sale. On November 3, Mozynski met Powers at 6 Denny Street. They both met Agent Guerard in his car. Powers and Mozynski again met Henderson in the basement of Henderson's apartment building at 27 Wachusett Street. Mozynski gave Henderson $3,000 and Henderson gave Mozynski a package. The package was delivered to Agent Guerard. Subsequent analysis disclosed that the contents of the package contained 81.09 grams of cocaine. A DEA agent took photos of Powers and Mozynski entering 27 Wachusett Street.

D.  The Fourth Sale

There were actually two more sales.  On November 16, Powers met with Henderson on the street while Mozynski waited a short distance away.  It was dark outside and Mozynski could not positively identify Henderson.  Henderson gave Powers a package, which Powers gave to Mozynski.  Analysis of the package disclosed that it contained wax, not crack cocaine.  Mozynski called Butter from Carey's apartment the evening of the wax sale.  Butter said that he would give Mozynski the crack cocaine he owed him.  Mozynski then met with Agent Guerard and gave him Butter's pager number, which Guerard called.  The agent spoke to Butter, who promised that he would give Guerard one ounce of crack cocaine the next day, November 17, and two and one half ounces the day after, November 18.  The beeper number Agent Guerard used to contact Butter was listed to "D. Henderson" of "27 Wahusset Street, Worcester, MA."  Henderson, whose middle name is David, lived at "27 Wachusett Street" in Worcester.  On November 17, Powers met Henderson at 27 Wachusett Street and Henderson gave her a package to give Mozynski.  Powers then met Mozynski and handed him the package which Mozynski gave to Agent Guerard.  An analysis showed that the package contained 19.68 grams of cocaine.

In addition to this evidence there was testimony by Powers that she bought crack cocaine from Henderson on a daily basis throughout the period of the conspiracy; that at times she

made purchases of crack cocaine several times a day; that she usually purchased crack cocaine one ounce at a time which she sold to her customers. Powers further testified that Carey regularly bought crack cocaine from Henderson during the period of the conspiracy. She also testified that Carey either used the crack cocaine himself or resold it to his own customers. Powers and Carey lived together during most of the conspiracy period.

## II.  **THE ISSUES**

We consider the issues in the order set forth in appellant's brief.

A.  The Admissibility of the Identification Testimony

Defendant filed a Motion to Suppress Identifications. There was a hearing on the motion prior to trial. The district court denied the motion by a margin notation, "Motion Denied." There were no findings of facts or rulings of law. "We will uphold a district court's decision to deny a suppression motion if the decision is supported by any reasonable view of the evidence." United States v. Campa, 234 F.3d 733, 737 (1st Cir. 2000). "Our review of a district court's decision to grant or deny a

suppression motion is plenary."[2] <u>United States</u> v. <u>McCarthy</u>, 77 F.3d 522, 529 (1st Cir. 1996).

There is an additional factor, however, that must be addressed in our consideration of the pretrial review of the suppression motion. There were two identification witnesses who testified at the hearing, Powers and Mozynski. In January 1999, Mozynski was shown a single booking photo of the defendant. Mozynski was asked "Who is this?" He replied, "It looks like Butter." In mid-February 1999, Powers was shown the same photo. Powers was asked if it was "Butter." She answered, "Yes."

The Supreme Court has dealt directly with this problem. In <u>Simmons</u> v. <u>United States</u>, 390 U.S. 377, 384 (1968), the Court held:

> Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are

---

[2]We are somewhat hampered in our review of the hearing on the motion to suppress because there seems to be no complete transcript of the pretrial hearing. There is an excerpt in the record of that portion of the hearing devoted to the admission of pawn shop receipts. It is, of course, the duty of the appellant to make sure the record is complete. We will do the best we can with what we have.

> unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, <u>we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification</u>.

(emphasis added). We have, of course, followed this teaching:

> Before excluding identification evidence, the court must be persuaded that there was a very substantial likelihood of irreparable misidentification. A court must also be mindful that it is only in extraordinary cases that identification evidence should be withheld from the jury.

<u>United States</u> v. <u>De Jesus-Rios</u>, 990 F.2d 672, 677 (1st Cir. 1993) (citations and quotation marks omitted); <u>see also</u> <u>United States</u> v. <u>Watson</u>, 76 F.3d 4, 6 (1st Cir. 1996); <u>United States</u> v. <u>Guzman-Rivera</u>, 990 F.2d 681, 682 (1st Cir. 1993).

We use a two-step test to make this determination. <u>See</u> <u>United States</u> v. <u>Lopez-Lopez</u>, 282 F.3d 1, 10 (1st Cir. 2002). The first step is to decide whether there was an impermissibly suggestive procedure. <u>See</u> <u>id.</u> We skip this step because the government has conceded that the photographic procedure was suggestive. Our next step is to "decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure." <u>Id.</u> at 10-11 (quoting <u>Watson</u>, 76 F.3d at 6). <u>Neal</u> v. <u>Biggers</u>, 409 U.S. 188, 199-200

-9-

(1972), is the keystone case on the determination of identification reliability. It enumerates five factors in the analysis: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation.

We make our analysis bearing in mind that "reliability is the linchpin in determining the admissibility of identification testimony." Manson v. Brathwaite, 432 U.S. 98, 114 (1977). We start with the testimony of Mozynski. As far as the first factor, Mozynski had at least three opportunities to view the defendant closely. This was not a single event crime. There were three face-to-face sales by the defendant to Mozynski. In addition, Mozynski had seen Henderson on one or two occasions before he started working for the government as an informant.

The next factor is the witness' degree of attention. The evidence demonstrates that Mozynski had a sufficient degree of attention; he testified at trial to specific details about the crack cocaine transactions with Henderson. Mozynski, for example, described how in one transaction Henderson wore a black, gold and white football jersey and a baseball hat; Mozynski also remembered receiving the crack cocaine in a plastic bag wrapped in newspaper.

The third factor is the accuracy of the witness' prior

description of the criminal. Mozynski's prior description of Henderson was not perfect. Mozynski described Henderson as weighing between 175 and 180 pounds when he actually weighed 150 pounds. Mozynski reported that Henderson was five feet, ten inches tall, when Henderson claims he is five feet, nine inches tall. Mozynski also said that Henderson had a medium complexion; Henderson says that he has a dark complexion. We are satisfied, however, that the other reliability factors are sufficiently persuasive to defeat any suspicion of unreliability raised by Mozynski's prior description. See United States v. Flores-Rivera, 56 F.3d 319, 331 (1st Cir. 1995) (other reliability criteria under Biggers sufficient to overcome unreliability engendered by one factor); Watson, 76 F.3d at 7 n.1 (upholding district court's finding that identification was reliable under Biggers where there was no prior description of the assailant but the witness had ample opportunity to focus on suspect and identified him within minutes of the assault).

The fourth factor, the level of certainty demonstrated by the witness at confrontation, does not give us reason to pause. Mozynski "remained steadfast in the positiveness of his identification[]," despite defense counsel's rigorous cross-examination. Souza v. Howard, 488 F.2d 462, 465-66 (1st Cir. 1973). The fifth Biggers factor is the length of time between the crime and the confrontation. The last time Mozynski observed

-11-

Henderson was in November 1998. Mozynski identified Henderson's photograph in January 1999. The six day jury trial ended on April 30, 2001. We do not find that this lapse of time militates against the reliability of Mozynski's in-court identification given the strength of the other factors. See Flores-Rivera, 56 F.3d at 331 (seven year gap between crime and identification permissible because other reliability criteria were sufficiently persuasive); Drougas, 748 F.2d at 28 (five year gap between crime and photographic identification permissible because witness spent considerable time with defendant).

Based on our thorough review of the record and application of the pertinent law to the facts we rule that Mozynski's identification of Henderson was sufficiently reliable to overcome the admittedly suggestive photo showing.

Henderson advances a plethora of reasons why Mozynski's identification should not pass muster: he argues that Mozynski did not know the defendant by his actual name; that Mozynski lied to the government when he said that he had met with Butter on at least one occasion; that Mozynski wore glasses because he suffered from blurred vision and double vision; that when shown the photo, Mozynski stated that "[i]t looks like 'Butter';" that Mozynski was mistaken as to the weight and complexion of the defendant; and that "during the entire period of Mozynski's observations of Butter, he suffered a worsening problem of memory loss."

Our conclusion regarding the reliability of Mozynski's identification makes a detailed examination of each argument unnecessary. For as the Supreme Court has stated:

> Surely, we cannot say that under all the circumstances of this case there is a very substantial likelihood of irreparable misidentification. Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

Manson, 432 U.S. at 116 (citation and quotation marks omitted).

Nor need we dwell too long on Powers' identification of defendant. There was evidence from which it could be found that she had known Henderson going back to 1994. Powers bought crack cocaine from Henderson for her own use and resale. She saw Henderson at her apartment daily during a six month period in 1994, at times spending an hour or more with him. Powers was present at all crack cocaine sales to Mozynski, as an ally of Henderson. During October and November 1998, Powers saw Henderson every day. Powers' identification of Henderson at the pretrial hearing and at the jury trial was positive and firm. In addition, we do not think the gap in time between Powers' last transaction with Henderson and her identification of Henderson's photograph calls into question the reliability of her in-court identification, particularly given

-13-

her close interaction with Henderson. See Flores-Rivera, 56 F.3d at 331; Drougas, 748 F.2d at 28.

Like those made regarding Mozynski, all of the defendant's arguments pertaining to Powers focus on her reliability: that she was under the influence of cocaine during the four sales; that she did not know the amount of money involved in the sales; that she was unable to tell how the cocaine was packaged. Suffice it to say that all of these factors were brought to the jury's attention.

We rule that Powers' testimony was properly submitted to the jury.

B. The Admissibility of the Pawn Shop Receipt

Henderson alleges that the court below committed "constitutional error" when it admitted into evidence a pawn shop sales receipt found in Henderson's wallet when he was arrested. The pawn shop receipt was signed by Henderson and indicated that Henderson pawned a watch on March 21, 1998, and redeemed it by paying $320 on November 6, 1998, just days after the November 3, 1998 drug sale. While Henderson objected at trial to the admission of the receipt, he did so on relevancy, not constitutional, grounds. If a new basis for objection is raised for the first time on appeal, that ground is not subject to harmless error review, and may only be reviewed for plain error. See United States v. Walsh, 75 F.3d 1, 5 (1st Cir. 1996). Review for plain error requires four

-14-

showings: (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of the judicial proceeding. See United States v. Gomez, 255 F.3d 31, 37 (1st Cir. 2001).

Henderson attacks the admission of the pawn shop receipt on the grounds that it both impermissibly shifted the burden of proof by requiring him to explain where he got the money to redeem the watch and, at the same time, constituted a "direct statement" to the jurors that they could make an inference against him based on his choice not to testify. Both contentions lack merit. Henderson overlooks the fact that the admission of any evidence offered by the government in a criminal trial gives the defendant a reason to testify if he has a basis for rebutting the government's theory of the case. The jury was properly instructed both as to the government's burden of proof and as to the defendant's right to remain silent. In light of these instructions, we fail to see how the admission of the pawn shop sales receipt, in and of itself, impermissibly shifted the burden of proof, or how it invited the jury to draw an inference of guilt from the defendant's choice not to testify. The district court's admission of the pawn shop sales receipt did not constitute plain error.

C. The Remaining Evidence

-15-

Because we are satisfied that the eyewitness testimony (including the identification evidence) and pawn shop sales receipt were sufficient to support Henderson's conviction on all five counts, we need only address whether there was sufficient evidence to support the verdict involving proximity to a school zone under 18 U.S.C. § 860. In determining the evidentiary sufficiency of a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998). "The scope of review is over the totality of the evidence, both direct and circumstantial." United States v. Czubinski, 106 F.3d 1069, 1073 (1st Cir. 1997).

Henderson avers that the district court erred when it did not grant his Rule 29 motion concerning the school zone violations attendant to the two transactions that took place at 27 Wachusett Street. In particular, Henderson is "perplexed" by the fact that the district court denied the motion even though Agent Anderson testified that the distance from the Elm Park Community School to 27 Wachusett Street was 1,095 feet, which he measured by walking the sidewalks. As Henderson correctly observes, 1,095 feet exceeds the statutory 1,000 feet needed to support a conviction in connection with section 860.

-16-

Be that as it may, Henderson neglects the fact that the proper way to determine whether a sale was 1,000 feet or less from a school is by measuring a straight line, rather than a pedestrian travel route. See United States v. Soler, 275 F.3d 146, 155 n.6 (1st Cir. 2002) (explaining that "the schoolyard statute envisions straight-line rather than pedestrian-route measurements"). Here, the government introduced into evidence, without objection, a map of the Elm Park Community School area which provided a detailed illustration of the distance between 27 Wachusett Street, where the drug transactions took place, and the school. This map demonstrated that each of the drug transactions occurred within 1,000 feet of the school; the government, in closing argument, pointed out as much to the jury. We do not hesitate to find that this evidence was sufficient to support the verdict.

D. The Five Year Limitation Contained in 21 U.S.C. § 851(e)is Constitutional

On March 9, 2001, the government filed an information pursuant to 21 U.S.C. § 851(a), notifying Henderson that the government would seek a twenty year minimum sentence based upon his 1991 South Carolina state court conviction for drug trafficking. The information charged that, on or about June 13, 1991, Henderson was convicted in South Carolina state court for distribution of cocaine. 21 U.S.C. § 851(e) states:

> No person who stands convicted of an offense
> under this part may challenge the validity of
> any prior conviction alleged under this

-17-

section which occurred more than five years before the date of the information alleging such prior conviction.

Because his prior conviction occurred more than five years before the filing of the government's information, the district court concluded that the plain language of section 851(e) precluded Henderson from denying the conviction, see id. § 851(b), or challenging its validity, see id. § 851(c).  Based upon this prior conviction, Henderson was sentenced to a mandatory minimum of 20 years in prison.  See id. § 841(b)(1)(A).

Although we have previously recognized that section 851(e) bars an appellant from challenging the validity of prior convictions that are more than five years old, see United States v. Romero-Carrion, 54 F.3d 15, 18 (1st Cir. 1995), we have not, until now, been asked to decide whether section 851(e) is constitutional. Henderson now poses the following question of first impression in this circuit:  Does the five year limitation period set forth in 21 U.S.C. § 851(e) violate the Due Process and Equal Protection Clauses of the Constitution?  We hold that it does not.

"We review de novo constitutional challenges to federal statutes."  United States v. Robinson, 137 F.3d 652, 653 (1st Cir. 1998).  As an initial matter, Henderson faces the hurdle that no court has sustained a constitutional challenge to 21 U.S.C. § 851(e), and at least six circuits have found the provision constitutional on both due process and equal protection grounds.

See <u>United States</u> v. <u>Reed</u>, 141 F.3d 644, 652 (6th Cir. 1998); <u>United States</u> v. <u>Prior</u>, 107 F.3d 654, 660-61 (8th Cir.), <u>cert. denied</u>, 522 U.S. 824 (1997); <u>United States</u> v. <u>Gonzales</u>, 79 F.3d 413, 426-27 (5th Cir.), <u>cert. denied</u>, 519 U.S. 869 (1996); <u>United States</u> v. <u>Arango-Montoya</u>, 61 F.3d 1331, 1338 (7th Cir. 1995); <u>United States</u> v. <u>McChristian</u>, 47 F.3d 1499, 1503 (9th Cir. 1995); <u>United States</u> v. <u>Williams</u>, 954 F.2d 668, 673 (11th Cir. 1992), <u>cert. denied</u>, 517 U.S. 1157 (1996). He urges us to depart from this precedent on the ground that some of these circuits have found section 851(e) constitutional based upon a misplaced reliance on <u>Custis</u> v. <u>United States</u>, 511 U.S. 485 (1994). According to Henderson, <u>Custis</u> considered only the constitutionality of 18 U.S.C. § 924(e)(1), and not section 851(e), and therefore has no bearing on our determination. We disagree.

In <u>Custis</u>, the Supreme Court examined section 924(e)(1), which provides no statutory right to collaterally challenge state court convictions that are used to enhance federal sentences under the Armed Career Criminal Act of 1984. Section 924(e)(1) raises the penalty for possession of a firearm by a felon from a maximum of 10 years in prison to a mandatory minimum sentence of 15 years and a maximum of life in prison without parole if the defendant "has three previous convictions . . . for a violent felony or a serious drug offense." The Court held that Congress' omission of language authorizing collateral attacks in section 924(e)(1)

-19-

indicated that it did not intend to give defendants the right to challenge the validity of prior convictions under this statute. Custis, 511 U.S. at 497. Thus, if Congress has the power to foreclose collateral challenges by merely omitting statutory language that authorizes such attacks, see 18 U.S.C. § 924(e)(1), then Congress can certainly preclude collateral challenges after five years where it explicitly includes such language in a statute.

Notwithstanding, Henderson counters that once Congress allows the use of collateral challenges, as it has for convictions less than five years old under section 851(e), any conditions imposed on the use of those challenges must accommodate fundamental liberties. He claims that the selection of a particular number of years to establish a time bar is patently arbitrary, and that the five year limitations period violates the Equal Protection Clause because it unfairly discriminates against those who commit a federal offense more than five years after a prior conviction. His arguments are not well taken.

The ban against challenging convictions over five years need only be supported by a rational legislative purpose because no fundamental right or suspect class is at issue in this case. See Reed, 107 F.3d at 661. The five year limitation on the right to collaterally challenge prior convictions at sentencing has a rational basis in light of both the administrative difficulties inherent in challenges to prior convictions, such as lost or

-20-

destroyed records, unavailable witnesses, and fading memories, and the interest in finality. See, e.g., Arango-Montoya, 61 F.3d at 1338. We therefore have no difficulty concluding that section 851(e) does not violate Henderson's right to due process and equal protection of the law.

E. Closing Argument

Henderson also takes issue with the government's closing argument. Specifically, he urges that the prosecutor improperly persuaded the jury to convict him by allegedly interjecting his personal opinion of the evidence, vouching for a witness, shifting the burden of proof and inflaming the jury. We address each of his arguments in turn.

1. Standard of Review

Where, as here, the defendant made no objection to the government's closing argument at trial, the standard of review is "plain error." United States v. Hernandez-Vegas, 235 F.3d 705, 710 (1st Cir. 2000). Henderson faces a high hurdle because it is established that plain error review "is ordinarily limited to 'blockbusters' and does not consider 'the ordinary backfires -- whether or not harmful to a litigant's cause -- which may mar a trial record.'" United States v. Griffen, 818 F.2d 97, 100. Henderson bears the burden of demonstrating that the prosecutor's remarks were prejudicial and affected his substantial rights. Id. at 55. Even then, error will not be recognized unless it caused a

-21-

"miscarriage of justice" or seriously undermined the "integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736 (1993). We consider whether the prosecutor's remarks had any likely impact on the jury based on the entire record, including the closing argument presented by the defense. See Joyner, 191 F.3d at 55.

2. Personal Opinion of the Evidence

We reject Henderson's argument that the prosecutor improperly interjected his personal opinion of the evidence when he characterized as "absurd" the defense's assertion that Powers was under the influence of drugs during the transactions. A prosecutor "may attempt to persuade the jury to draw suggested inferences unfavorable to the defense, as long as the prosecutor's own opinion as to the witness' credibility is not urged on the jury." United States v. Smith, 982 F.2d 681, 683 (1st Cir. 1993).

In this case, the prosecutor offered no opinion concerning the credibility of the defense witnesses. Instead, during his closing argument, the prosecutor responded to a persistent suggestion made by the defendant that Powers had been on drugs during the transactions and thus could not remember the detailed information she provided during her testimony. The prosecutor did this by asking the jury to focus on the tape recordings made of those transactions:

> And don't the tapes prove to you how absurd
> the defendant's claims are that Powers was too

-22-

> high or too crazy to have accurately perceived the events which occurred during the conspiracy? Don't the tapes, in fact, prove that Powers became suspicious that Special Agent Guerard might be a cop right after she met him?

It is apparent that the prosecutor asked the jury to consider whether the evidence before it -- tape recordings in which Powers correctly perceived that Mozynski's alleged drug customer was an undercover police officer -- refuted defendant's contention that Powers' mind was too altered to observe and remember the drug transactions. There was nothing improper in the government identifying for the jury a specific item of evidence and arguing that the jury should infer from that piece of evidence that the defendant's theory was not worthy of belief. See United States v. Mount, 896 F.2d 612, 625 (1st Cir. 1990); United States v. Garcia, 818 F.2d 135, 143 (1st Cir. 1987). Accordingly, the district court did not commit plain error by allowing the prosecutor's statement.

Henderson challenges other statements in the government's closing on the ground that the prosecutor again offered his personal opinion of the evidence when he told the jury:

> Look at the evidence with a very stern and suspicious eye. And if you do that, you'll have no doubt that the government has sustained its burden.

Henderson says these statements implied that the jury "could not return a verdict of not guilty without failing to consider the evidence closely." What Henderson fails to consider is that a

-23-

prosecutor has a right to comment on the plausibility of the defense theory. See Garcia, 818 F.2d at 143. Here, the prosecutor suggested that a careful review of the evidence would reveal that the government's theory of the case was more plausible than Henderson's theory of the case. This suggestion properly directed the jury's attention to the evidence presented at trial.

We also disagree with Henderson that the prosecutor interjected his personal opinion of the evidence in rebuttal when he commented "if you ask the wrong questions, you get the wrong answers," and "if you ask the right questions in this case, there's no doubt but that their clients will be convicted." These comments were not inappropriate because "[a]lthough it is the jury's job to draw inferences, there is nothing improper in the Government's suggesting which inferences should be drawn." Mount, 896 F.2d at 625.

Here, the prosecutor argued that Henderson's theory of the case directed the jury to the "wrong" questions, whereas the government's theory directed it to the "right" questions; presumably, these were questions based on the evidence. We see no reason why the prosecutor should be prohibited from suggesting that the government's theory of the case did a better job of focusing on the evidence. The prosecutor was entitled to argue that the jury should look at the evidence to determine Henderson's guilt. We see no plain error.

## 3. Vouching

Henderson next maintains that the prosecutor vouched for Powers in his closing argument when he stated that Powers "repeatedly told you that she was told to tell the truth, to tell the truth when she took the stand." A prosecutor may not place "the prestige of the government behind a witness by making personal assurances about the witness' credibility." United States v. Neal, 36 F.3d 1190, 1207 (1st Cir. 1994).

There were no such personal assurances from the government in this case. The prosecutor's statement merely summarized Powers' prior testimony, and was within the accepted bounds of argument. See United States v. Auch, 187 F.3d 125, 131 (1st Cir. 1999). We note that the prosecutor did not express his personal opinion about Powers' credibility; nor did the prosecutor suggest that special circumstances, such as Powers' plea agreement, ensured her honesty. See United States v. Wihbey, 75 F.3d 761, 772 (1st Cir. 1996); United States v. Dockray, 943 F.2d 152, 156 (1st Cir. 1991). Furthermore, the prosecutor's statement came after defense counsel suggested in cross-examination that Powers had been coached by the government. We find that the prosecutor's statement did not constitute improper vouching.

## 4. Shifting the Burden of Proof

Henderson also complains that the prosecutor improperly commented on his right to remain silent when he responded to

-25-

defense allegations that the government had failed to call a supposedly percipient witness. It is established that any comment by a prosecutor on a defendant's exercise of the right to remain silent violates the Fifth Amendment's guarantee against self-incrimination. See Wihbey, 75 F.3d at 769.

In the closing argument, defense counsel suggested that the government was hiding something by not producing Lynn Cappulett, an individual whom Powers and Mozynski each identified as having been at Carey's residence during the first drug transaction on October 19:

> [The government] never tracked down Lynn Cappulett. Mozynski and Powers both said that she was at 6 Denny Street on October 19, 1998. And according to Mozynski the first deal happened right in front of her eyes. Yet, did you hear any evidence that Agent Anderson or Agent Guerard ever tried to find her or talk to her? This was an eyewitness to what went on inside the building.

In rebuttal, the prosecutor replied:

> Where is Lynn Cappulett, both counsel ask you? Well, that's a good question. Why don't they tell us? Maybe defense counsel could have interviewed Lynn Cappulett.

The prosecutor's response was not such that "jurors would probably interpret it as commentary on the accused's failure to take the stand," United States v. Taylor, 54 F.3d 967, 979 (1st Cir. 1995), particularly because it was made in rebuttal after defense counsel had themselves raised the issue. See United States v. Nickens, 955 F.2d 112, 122 (1st Cir. 1992) (evaluating effect of

-26-

statement made in rebuttal argument). Under the invited response rule, if the prosecutor's remarks were "invited," and "did no more than respond substantially in order to right the scale," such comments do not warrant reversal. Id. (internal quotations omitted). Here, defense counsel invited a response by raising the issue of Lynn Cappulett's whereabouts in the first instance. The prosecutor's remarks were limited and addressed only the defense counsel's own comments. See id. at 123. Thus, there was no plain error when the district court did not, on its own initiative, strike portions of the government's rebuttal argument.

5. Inflaming the Passions of the Jury

We cannot agree with Henderson that the district court erred when it did not, on its own initiative, strike the prosecutor's description of Henderson as "a successful businessman in the business of crack cocaine," who wanted a "windfall" verdict in his favor. When the evidence of a defendant's guilt is strong, a court should be very reluctant to find plain error in "misguided rhetoric." United States v. Sepulveda, 15 F.3d 1161, 1188 (1st Cir. 1993). Under plain error review, improper remarks are grounds for reversal only if they "so poisoned the well that the trial's outcome was likely affected." Id. (internal quotations omitted). We place a prosecutor's remarks in context when determining whether they were inappropriate. See id. at 1187.

Henderson posits that the prosecutor's comments improperly appealed to the passions of the jury. To the contrary, we fail to see how these remarks would distract the jury from focusing on whether the evidence established guilt beyond a reasonable doubt. See United States v. Manning, 23 F.3d 570, 574 (1st Cir. 1994). Defense counsel suggested in his opening that Henderson was a legitimate businessman; the prosecutor countered that suggestion by arguing that Henderson was in the business of selling drugs. Here, defense counsel invited a response by suggesting that Henderson "worked hard" in the "music promotion business," and was "successful." The prosecutor, in turn, offered a reply that was not only supported by the evidence but was properly limited and addressed only the defense counsel's own comments. See Nickens, 955 F.2d at 123. There was nothing improper in this suggestion.

Nor did the district court err when it permitted, as Henderson claims, the prosecutor to tell the jury that it could convict him "even if they found that the defendant was not the distributor of the cocaine." This is somewhat misleading. In his closing, Henderson's counsel suggested that someone other than Henderson was the crack cocaine supplier. The prosecutor responded:

> What are the odds that there was a different supplier in this case in light of the following facts: First, a person that you might well find at a minimum bears a striking

-28-

> resemblance to this individual, even if you don't find that it's him, walks into 6 Denny Street at the exact time of a crack distribution on October 19th. Coincidence?

When read in its proper context, it is apparent that this comment, while unartfully expressed, is innocuous. It certainly would not suggest to the jury that it could convict the defendant even if it found that the person alleged to be the supplier of the cocaine was not the defendant. Furthermore, the court's instructions to the jury clearly explained that the ultimate question for the jury was whether Henderson was the supplier of crack cocaine on the dates in question. We conclude that Henderson's conviction should not be disturbed on the basis of these statements.

We also disagree with Henderson that the prosecutor improperly appealed to the passions of the jury during rebuttal by commenting, with regard to Henderson's defense theory, "[w]hat is this, the Jerry Springer show?" Given the strong evidence against Henderson, the prosecutor's "misguided rhetoric," Sepulveda, 15 F.3d at 1188, if it was even that, does not rise to the level of plain error. See Joyner, 191 F.3d at 55. We conclude that Henderson's conviction should not be disturbed on account of the prosecutor's reference to the Jerry Springer show.

F. Co-conspirator's Statements

Henderson argues, in summary fashion, that the only evidence that indicates he engaged in any conspiracy was the suggestive identifications of Mozynski and Powers, which, according

-29-

to Henderson, should have been excluded in the first instance. Because his challenge to the co-conspirator statements is premised solely on the identifications being improperly admitted, we need not consider the admissibility of these statements in light of our conclusion that the district court did not err in admitting the identifications.

In any event, we are satisfied that even without the identification testimony the evidence was sufficient for a jury to conclude that Henderson was part of a conspiracy to sell crack cocaine. This includes: the videotape of Henderson taken by the DEA at 6 Denny Street at the October 19, 1998 drug transaction; Agent Anderson's identification of Henderson; the fact that the pager used in the drug transactions was subscribed to by D. Henderson of 27 Wahuset Street in Worcester; and the fact that Henderson lived at 27 Wachusett Street, where two of the drug transactions took place. This evidence, aside from the identifications of Mozynski and Powers, was sufficient for a rational trier of fact to find Henderson guilty beyond a reasonable doubt. See United States v. Loder, 23 F.3d 586, 589 (1st Cir. 1994).

G. Jury Instructions

Henderson alleges three errors in the district court's jury instructions, which he believes "incorrectly diminished the evidentiary requirements for finding the defendant guilty."

Specifically, he challenges the jury instructions concerning identification, aiding and abetting and conspiracy. We review for "plain error" because Henderson did not raise his objections to the jury instructions at trial. See Gomez, 255 F.3d at 37.

Turning to the identification instruction, we begin by noting that the district court provided a lengthy instruction:

> Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later. Whether the witness had an adequate and effective opportunity to observe the offender at the time of the offense may be affected by such matters as: (1) how long or short a time was available; (2) how far or close the witness was to the scene of the offense; (3) how good was the lighting; (4) whether the witness was under the influence of drugs; and (5) whether, and the extent to which, the witness had occasion in the past to see or know the person identified. If the identification by the witness may have been influenced by circumstances under which an image of the defendant was presented to the witness for identification, you may consider those circumstances as well. You may also take into account that an identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of an image of the defendant alone to the witness.

Henderson, without citing any authority, complains that this instruction "fell far short of the detail required by this case." We disagree. Contrary to Henderson's view, the instruction was thorough and suitably focused on the reliability of the

-31-

identification as contemplated by the case law.  See Manson, 432 U.S. at 114 ("[R]eliability is the linchpin in determining the admissibility of identification testimony"); Lopez-Lopez, 282 F.3d at 10-11; Watson, 76 F.3d  at 6.   The district court was not required to accept Henderson's alternative instruction because its own instruction was proper.  See United States v. Arcadipane, 41 F.3d 1, 8 (1st Cir. 1994) (a defendant "is not entitled to the nuances of phrasing that he finds most soothing").

Henderson further avers that the district court's aiding and abetting instruction permitted the jury to convict without finding specific intent.  See Loder, 23 F.3d at 591 (discussing specific intent requirement for aiding and abetting).  In order to sustain a conviction for aiding and abetting the government must prove, in addition to the commission of the offense by the principal, that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal.  See United States v. Spinney, 65 F.3d 231, 235 (1st Cir. 1995).

With this in mind, the district court instructed the jury that, inter alia, the government must prove beyond a reasonable doubt, first that someone committed the charged crime, and second,

> that the defendant then under consideration
> willfully associated himself in some way with
> the crime and willfully participated in it as
> he would in something he wished to bring
> about.  This means that the government must
> prove that the defendant consciously shared

-32-

> the other person's knowledge of the underlying
> criminal act and intended to help him.

This is all the law requires; the district court's instruction adequately set forth the elements of aiding and abetting.

Finally, Henderson asserts that the conspiracy instruction allowed the jury to convict him without finding the necessary intent. This argument is without merit. To prove intent for conspiracy, the government must prove beyond a reasonable doubt that the defendant intended to join in the conspiracy and intended the substantive offense to be committed. See Gomez, 255 F.3d at 35. The district court properly instructed the jury on the requisite intent to support a conspiracy conviction:

> The government must prove two kinds of intent
> beyond a reasonable doubt before Chamond
> Henderson . . . can be said to have willfully
> joined the conspiracy: an intent to agree and
> an intent, whether reasonable or not, that the
> underlying crime be committed.

This formulation accurately states the requisite intent needed for a conspiracy conviction. See United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989). Accordingly, we are confident that the jury instructions do not constitute plain error.

H. Apprendi

Henderson's last argument is that the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), requires the government to prove his 1991 South Carolina conviction beyond

a reasonable doubt.  Our review is de novo.  See United States v. Sacko, 247 F.3d 21, 24 (1st Cir. 2001).

We have consistently observed with a "regularity bordering on the monotonous," that Apprendi does not apply to sentencing enhancements based on prior convictions.  United States v. Moore, 286 F.3d 47, 50 (1st Cir. 2002); see also United States v. Bradshaw, 281 F.3d 278, 294 (1st Cir. 2002); United States v. Gomez-Estrada, 273 F.3d 400, 402 (1st Cir. 2001).  Accordingly, we reject Henderson's argument.

**Affirmed.**