IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2002

## STATE OF TENNESSEE v. LEON J. ROBINS and TABATHA R. WHITE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-B-1140     Walter Kurtz, Judge**

_____

**No. M2001-01862-CCA-R3-CD - Filed March 20, 2003**

_____

The defendants, Leon J. Robins and Tabatha R. White, both were convicted of first degree premeditated murder and sentenced to life imprisonment. In their appeals, they argue that the evidence was insufficient to sustain their convictions for first degree murder; the trial court should have instructed as to the lesser offenses of voluntary manslaughter and facilitation to commit voluntary manslaughter; evidence of a photographic lineup was improperly admitted; and the trial court improperly admitted Robins' mugshots as exhibits and improperly limited the cross-examination of a prosecution witness as to prior bad acts. Based upon our review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

John E. Rodgers, Jr., Nashville, Tennessee, for the appellant, Leon J. Robins; and David P. Byrne and Charles E. Sizemore, Nashville, Tennessee, for the appellant, Tabatha R. White.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Bret T. Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

Around 10:00 p.m. on February 29, 2000, Lyntasha Simmons was inside her apartment at Nashville's Parkway Terrace Apartments when she heard gunshots outside. She looked out her door and saw a person lying on the ground. She had just telephoned the police when an onlooker informed her that it was her brother, Eugene Simmons, also known as Michael Roach, who had been shot. Simmons dropped the phone, ran to her brother's side, and waited for the police to arrive. The

victim was transported by ambulance to Vanderbilt Hospital where he died the next day. Metro Nashville Police Officer Terrence Graves testified that, at 10:08 p.m., he received a dispatch regarding a shooting at that location. He arrived within a minute, saw that the victim had suffered gunshot wounds, and secured the scene.

Amelia Patterson testified that she, along with Pamela Johnson, Tara Johnson, and their cousin, Gerald Johnson,[1] was standing on the porch outside of Pamela's apartment on the night of the shooting.[2] Pamela was on her cell phone talking to a person she referred to as "Tab" when she, referring to the victim, said, "[H]ere he go right here." Pamela told Gerald to bring the victim to her porch. Gerald approached the victim, who was walking just a few feet away, and "kind of like shook him up and brought him over to the porch." The victim "was refusing, but he finally came over there," and Pamela put him on the phone to speak with Tab, who wanted to "talk to him about her money." Patterson testified, "All I heard him say was that he was going to give her her money at 11:30." Patterson said the conversation ended, and "I guess they had told her that they was on their way. They was on the Interstate and she had hung up." Pamela informed her that their discussion concerned "ten-dollars ($10.00) worth of white," meaning cocaine.

The victim proceeded to walk away when Pamela again instructed Gerald to bring him back to the porch. The victim protested, explaining that he had to go heat up the bag of food that he was carrying. Pamela responded that he could heat it up at her house and, apparently accepting this offer, he began walking toward her porch. Patterson testified that the victim "didn't make it on the porch," however. At this moment, Tab, accompanied by a man, emerged from the parking area and asked, "where her mother-fucking money was." The victim was never given the opportunity to respond to Tab's demand as the man, who was approximately five or six feet away from the victim, pulled a gun from his pocket and shot him. From the witness stand, Patterson identified Tab as the defendant Tabatha White and the gunman as the defendant Leon Robins. Patterson testified that the police attempted to question Pamela Johnson the night of the shooting, but she "wasn't really cooperating" and was "acting like she was hallucinating."

Tara Johnson testified that, in the days preceding the murder, Tabatha White asked her to keep on the lookout for the victim because she had given him "ten-dollars ($10.00) to do something for her." She remembered Pamela Johnson talking to White on her cell phone on the night of the shooting and informing her that the victim was present. She testified that Pamela told Gerald Johnson to bring the victim to her, which he did. The victim spoke with White on the telephone and told her that he would pay her at 11:30. As the victim attempted to leave, Gerald forced him to stay, and Pamela told him to heat his food at her house. Before the victim could enter the house, Tabatha White and a man approached. White said "she wanted her mother-fucking money," and the "dude" shot the victim. Tara heard three gunshots fired and ran into the house. She testified that she did

[1]Because three of the parties share the same last name, we will refer to these witnesses by their first names. We intend no disrespect by this usage but do so to avoid continually utilizing their entire names.

[2]The precise relationship of Pamela and Tara Johnson is unclear. At different points in the transcript, the two women are referred to as sisters, stepsisters, and sisters-in-law.

not see either person's face, but recognized the voice as that of Tabatha White, even though she "didn't really know [her] that much."

Pamela Johnson testified that the defendants were at her house "[e]ither one or two days before" the shooting, and Tabatha White gave the victim ten dollars to procure drugs. Although she had known White "[f]or about two or three years," it was her first encounter with Leon Robins. When the victim failed to return with either the drugs or the money, White was "mad" and instructed Johnson to be on the lookout for him. On the night of February 29, Johnson, standing in her doorway, spotted the victim and called White on a cell phone. Johnson then called the victim over and put him on the phone with White. The phone cut off and the victim proceeded to leave. She called White back and had her cousin, Gerald Johnson, bring the victim back to the front of her house. Moments later, Robins shot the victim and White said "something to him about her money." Johnson testified that she thought the defendants were "just going to beat him up or something."

Detective Danny Satterfield of the Metro Police Department testified that, before trial, Pamela Johnson had told him that she was inside her house when the shooting occurred and could not identify the shooter. At Tabatha White's bond hearing, Johnson again stated that she did not witness the shooting and denied making phone calls to White prior to the shooting.

Saying that she had been scared, Pamela Johnson admitted to lying to the police on the night of the shooting by telling them both that she did not know who shot the victim and that Tabatha White had not been there, as well as lying at White's bond hearing. According to Johnson, White had called her and said "just keep the cool and . . . everything will be all right." At some point, however, Johnson changed her story and identified both defendants from photographic lineups, explaining that she "just had to tell the truth" and her "kids don't need to be having a momma that is getting in trouble for something she didn't do." On cross-examination, it was elicited from Johnson that the police "coerced" her regarding her testimony. However, neither the details of the alleged coercion, nor its alleged effect, was revealed.

Detective Satterfield testified that, during his investigation, he spoke with Amelia Patterson who told him that "she was there and witnessed the shooting incident." On March 9, 2000, he showed her a photographic lineup of suspects from which she identified Robins without any uncertainty as the man who shot the victim. From another photographic lineup, she identified Tabatha White as the woman who was with Robins. That same day, Detective Satterfield spoke with Tara Johnson, who also witnessed the shooting, and showed her identical photographic lineups.

Because of the extensive questioning of Tara Johnson's selections from the male and female photographic lineups, we will set out the details of this matter. The record on appeal includes a copy of each, that of the females depicting Tabatha White as photograph number 4 and that of the males depicting Leon Robins as photograph number 6. On the form that corresponds to the *male* lineup, she identified "Picture No. 4, White, Tabatha" as "somebody she knew," explaining, "This is Tab. Don't know if Tab was there." However, she made no marks on the form corresponding to the

female lineup. Thus, the form that was filled out for the male lineup actually refers to the female lineup, and no form was filled out by the witness corresponding to the male lineup.

Victoria Shelton, who lived in the apartment complex where the shooting occurred, testified that, on that night, she was inside her house and overheard Gerald Johnson tell the victim "that he was going to give him something." When the victim explained that he would pay him later that night, Gerald Johnson "kept saying no." "A few seconds, a couple of minutes" later, she heard four gunshots, went outside, and saw the victim on the ground. She saw a white Chevrolet Cavalier leave the parking lot, and she said that a "light-skinned male black" usually drove that particular car.

Harold Overton testified that he lived in Apartment U-166 at the Knollcrest Apartments. On March 3, 2000, Detective Clifford Mann, responding to an anonymous CrimeStoppers tip, visited Overton to question him about Tabatha White, who lived in nearby apartment U-162. He told Detective Mann that he was familiar with White and her occasional visitor, Leon Robins, whom he identified from a photographic lineup. A few nights earlier, according to his testimony, he witnessed Robins engaging in the following conversation:

> There was [sic] about three or four guys that were talking, and then one guy walked up and he said Leon, man, . . . they are looking for you . . . . And then he said, like, well, I don't give a fuck, you know, there is more than one Leon . . . and then he said besides that, they don't know my last name[.]

On cross-examination, Overton testified that he was fifteen to twenty feet away from the conversation and that, although it was dark, the area was well lit by a streetlight.

Dr. Bruce Levy, the Davidson County Medical Examiner, testified that the victim was shot twice. One bullet entered the middle of the forehead and the other entered the back of the left thigh. As to the head wound, Dr. Levy concluded that the barrel of the gun was greater than two feet away when fired. Based on toxicology tests, he testified that the victim was under the influence of cocaine at the time of the incident.

Cody Sims, customer operations manager for Cricket Communications, a cellular telephone company, testified that Pamela Johnson was a customer on February 29, 2000, and that her cell phone number was 615-485-5158. Laurie Turner, a legal affairs coordinator for Powertel, another cellular telephone company, testified that, according to company records, Tabatha White was a customer on February 29, 2000, and, on that day, three consecutive incoming calls were received on her cell phone from Pamela Johnson's 615-485-5158 phone number. The respective times for those three calls were 9:52, 9:53, and 9:58 p.m.

Marion Tucker testified on behalf of Leon Robins that, on the night of February 29, he, apparently, was a witness to the confrontation with the victim, saying, "I seen this female come up

[and] assault [the victim] over ten-dollars ($10.00), and I turned around and ran, and that is all I seen." He stated that the woman who said "Where my ten dollars at?" was holding a gun.

Robins' sister, Nicole House, testified that she was with him at their mother's house on the night of the shooting and, when she left "[b]etween 10:15 and 10:30," he was still there. On cross-examination, she testified that, although she had learned at the preliminary hearing the time and date of the murder for which her brother had been charged, she did not inform the police that she had been with him at the time of the killing. Martinique Robins, another sister of the defendant, also testified that, on the night of the murder, he still was at their mother's house when she departed, sometime "close to 10:30." Like her sister, she did not contact the police about her brother's whereabouts on the night and time of the shooting. Robins' mother, JoAnn Hardy, testified that her son was at home when she returned from work shortly after 11:00 p.m. on the night of the shooting.

Tabatha White's mother, Raven White, testified that her daughter was with her at her house at the time of the shooting. On cross-examination, she admitted that at her daughter's bond hearing, she stated that she went to bed around 9:00 p.m. on the night of the shooting. White's father, James White, testified that he usually goes to bed at "7:30 or 8:00" and that, on the night of the shooting, his daughter "was there when I went to bed. She was there when I got up. Other than that, I can't tell you nothing." But, he testified, if she were to have left while he was asleep, the dogs would have awakened "everybody just about in the neighborhood."

## ANALYSIS

### I. Sufficiency of the Evidence

Both defendants challenge the sufficiency of the evidence, arguing that there was no evidence of premeditation.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendants were convicted of first degree premeditated murder which is defined, in pertinent part, as follows:

(1) A premeditated and intentional killing of another;

. . . .

(d) As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(a)(1), (d) (1997).

In Tennessee, a homicide is presumed to be second degree murder, and the State bears the burden of proving the element of premeditation necessary to elevate the crime to first degree murder. See State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn.), cert. denied, 531 U.S. 967, 121 S. Ct. 401, 148 L. Ed. 2d 310 (2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). The circumstantial evidence of premeditation must, however, be "so

strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

Whether premeditation is present is a question of fact for the jury to determine from all the circumstances of the case. State v. Story, 608 S.W.2d 599 (Tenn. Crim. App. 1980). The use of a deadly weapon upon an unarmed victim, a lack of provocation, and an attempt to shoot the victim again after he had been felled by the first shot and rendered helpless are all circumstances that have been held to be indicative of premeditation. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Anderson, 835 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Robins argues that there is no proof that he "planned to murder the victim or that they had a previous argument or prior relationship," and, thus, the State failed to prove the element of premeditation. However, based upon the testimony, a reasonable jury could conclude that Robins came to the scene with White, to whom the victim owed money, for the purpose of confronting the victim about the debt and, without hesitation, conversation, or provocation, fatally shot the unarmed victim in the head and the back of the leg. We conclude that sufficient evidence existed to allow the jury to infer premeditation from the facts surrounding the homicide.

Robins makes additional arguments against the sufficiency of the evidence: the witnesses discussed the case before they gave their statements; Pamela Johnson was also charged in the instant offense; and the police coerced witnesses. However, the jury heard the testimony upon which the defendant relies in making these arguments, and the credibility of the witnesses was resolved in favor of the State. The appellate court "may not reconsider the jury's credibility assessments." State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600, 150 L. Ed. 2d 757 (2001).

White argues that the evidence at trial was insufficient to support a first degree murder conviction under a theory of criminal responsibility because it failed to "provide a sufficient nexus" between her conduct and the murder. According to her argument, the evidence showed only that she accompanied Robins when he shot the victim.

A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (1997). This wording is intended to include the conduct of defendants formerly known as accessories before the fact and aiders and abettors. See id. § 39-11-402, Sentencing Commission Cmts. Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . ., based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). Under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime. See id.

Taken in the light most favorable to the State, the proof demonstrated that White gave the victim money to purchase drugs for her, the victim apparently absconding with her funds. White was angered and was looking for the victim, instructing others to do the same. She was alerted to the victim's presence by the telephone call from Pamela Johnson, who summoned the victim to the phone because "Tab want[ed] to talk to him about her money." Over the phone, White discussed the debt with the victim. Shortly thereafter, White arrived on the scene, demanding her "mother-fucking money," as her codefendant twice shot the victim. A jury could reasonably infer from this evidence that she shared the criminal intent to kill the victim. Accordingly, we conclude that the record supports, under a theory of criminal responsibility, White's conviction for first degree murder.

White makes the additional argument that two statements of the trial court show that the court misunderstood the facts, resulting in the court's ruling incorrectly on her motions for judgment of acquittal and for a new trial. During the arguments on White's request for a judgment of acquittal, the trial court stated that "the proof about Ms. White's request to Ms. Johnson is that, I mean, she said keep him there. Don't let him get away. I'm coming." The context in which this statement was made was that, in considering the State's arguments as to why the acquittal motions should be denied, the court paraphrased the proof, not attempting to quote actual testimony. In fact, the court noted that the State had not proven that White directed Gerald Johnson to use physical force to keep the victim at that location, explaining that "there is no indication that Ms. White directed that force be used or anything that she expected force to be used." Accordingly, the court granted the motions for judgment of acquittal as to both defendants on the especially aggravated kidnapping and felony murder charges. Thus, we respectfully disagree that this statement shows that the court misunderstood the proof.

The next part of White's argument that the trial court misunderstood the facts points to the court's statement, during the hearing on the motions for new trial, that "it was Ms. White who requested that the victim be held there or detained there until she and Mr. Robins could arrive, and then he was almost instantly shot down." The trial court made this statement, responding to arguments of Robins' counsel as to why his motion for a new trial should be granted, prompting counsel then to respond, "But that was Pamela Johnson's testimony, which was contradicting to the testimony that she had given at the bond hearing." However, it is clear from the comments of the trial court in overruling the motions for new trial, that the court relied upon all of the proof presented and did not focus or base its ruling upon the alleged misstatement cited by Robins.

Accordingly, we conclude that the evidence was sufficient, as it relates to both defendants, to support the convictions of each for first degree premeditated murder.

## II. Failure to Instruct as to Lesser Offenses

Robins argues that the killing was not "free from passion of the moment" and, therefore, the trial court committed error by failing to charge the jury with voluntary manslaughter or facilitation to commit voluntary manslaughter as lesser-included offenses of first degree murder.

In every criminal case, the trial court has a duty to instruct the jury on any lesser-included offense of the offense charged for which the evidence would support a conviction. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001). Whether a court properly instructed a jury concerning lesser-included offenses is a mixed question of law and fact, and, therefore, the standard of appellate review is *de novo* with no presumption of correctness. Id.

The analysis which a trial court must utilize in identifying the lesser-included offenses to be charged to the jury was explained in State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999):

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense. This two-step analysis is practical, can be easily applied by the trial courts, and remains broad enough to preserve both the State's and defendant's rights to consider any lesser-included offenses fairly raised by the proof.

During the trial in this matter, the court solicited from counsel their positions as to what lesser-included offenses should be included in the charge. As to Robins, the State argued that the jury should be instructed as to first and second degree murder, but that a voluntary manslaughter instruction was not required because there was no evidence of "adequate provocation that would lead a reasonable person to act in an irrational manner." Counsel for Robins responded that Marion Tucker had testified "that a female shot the victim." Responding to the court's noting that Tucker had not said that the female shooter was accompanied by a man, counsel said that "arguably, the jury could infer facilitation on behalf of Mr. Robins." The court, however, disagreed with this argument and adopted the State's position, saying that Tucker "didn't say there was a woman with a man there, and he couldn't identify the woman, so I don't think, I don't think that is sufficient to get facilitation. I think the State's attorney's analysis of this is correct."

Tennessee Code Annotated section 39-13-211(a) defines voluntary manslaughter as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." We agree with the analysis of the trial court that the record contains no evidence that, at the time of the killing, Robins was "in a state of passion produced by adequate provocation" resulting in his acting "in an irrational manner." Rather, the State's proof was that, egged on by White, Robins shot the victim because of money owed to White. By the defense theory, Robins was not involved in the shooting and, apparently, was not even present. Thus, we conclude that the trial court was correct in its determination that instructions for voluntary manslaughter and facilitation were not required. However, even if the trial court did err by not instructing the jury as to voluntary manslaughter and facilitation, the error was

harmless. As to Robins, the jury was instructed both as to first degree premeditated murder, the indicted offense, and second degree murder, a lesser-included offense, with the jury determining that he was guilty of the greater offense. Procedurally, this situation is identical to that of State v. Williams, 977 S.W.2d 101 (Tenn. 1998), in which our supreme court determined that the trial court's failure to instruct the jury as to voluntary manslaughter was harmless error:

> By convicting the defendant of first degree murder the jury determined that the proof was sufficient to establish all the elements of that offense beyond a reasonable doubt, including that the killing was "intentional, deliberate and premeditated." In other words, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter. Accordingly, the trial court's erroneous failure to charge voluntary manslaughter is harmless beyond a reasonable doubt because the jury's verdict of guilt on the greater offense of first degree murder and its disinclination to consider the lesser included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter.

Id. at 106 (footnote and citation omitted).

We conclude that this assignment is without merit.

### III. Admissibility of Photographic Lineup

On appeal, Robins argues that the trial court erred by not suppressing the photographic lineup, saying that it was defective because it did not include photographs of his codefendant, Gerald Johnson, or of other "African-American males who frequented the neighborhood." Additionally, he argues that because Amelia Patterson viewed the lineup ten days after the killing, and Pamela Johnson did so ten months later, his right to due process was violated, there having been "plenty of time to corroborate their investigation."

At the trial court, both following the hearing on the motion to suppress and at the motion for new trial, Robins did not make the claim that the photographs should have included certain individuals, as he now argues. Instead, he argued that the photographic array was unfair because all persons depicted were not of the same complexion as the defendant. As stated in State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993), "[a]n appellant cannot change theories from the trial court to the appellate court." Accordingly, we conclude that this portion of Robins' complaint as to the photographic lineup is not properly before the court. However, even if this claim had not been waived, we would conclude that it is without merit. While a photographic lineup may be unfair because of what it does include, such as photographs, the nature of which direct attention to the

-10-

suspect, the defendant cites no authority for the converse, that unfairness can result because certain photographs were not included among the batch shown to a witness.

We now will consider the claim that Robins' due process rights were violated because Amelia Patterson viewed the photographs ten days after the killing and Pamela Johnson did so ten months later.

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive; and (2) gives rise to a "very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). In Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972), the Supreme Court adopted a "totality of the circumstances" analysis to be used in evaluating the reliability of suggestive identifications. Based upon our review of the photographic lineup, we conclude that the identification procedure, the lineup consisting of the defendant's photograph and those of five other African-American men, was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. The other men included in the lineup are similar to the defendant in age, size, and complexion. Consequently, it is unnecessary to apply the totality of the circumstances test described in Biggers. See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990) (holding that Biggers analysis does not apply to a photographic lineup that was not unduly suggestive due to close similarities in the age, build, complexion, hair, and eye color in all but one of the participants).

Robins does not rely upon the reliability factors to attack the photographic lineup identifications made by Amelia Patterson and Pamela Johnson, arguing instead that the identifications should have been suppressed because of the passage of time, ten days and ten months, respectively, between the killing and the identifications. Other courts, however, applying the holding in Biggers, have approved identifications made long after the crime. Our supreme court, in State v. Carter, 714 S.W.2d 241, 249 (Tenn. 1986), approved a five-month gap:

> The time between the crime and the confrontation of five months was longer than the time lapse in most cases. But considering the witness' age and focus on the unusual activity of defendant and Price in hanging around the rest area on a cold night at a time when he was on the lookout for thieves, we see little if any likelihood of misidentification arising from this factor.

See United States v. Henderson, 320 F.3d 92, 101 (1st Cir. 2003) (witness last saw the defendant in November 1998, identified the defendant's photograph in January 1999 and during April 2001, these gaps not militating "against the reliability of [the] in-court identification given the strength of the other factors"); United States v. Flores-Rivera, 56 F.3d 319, 331 (1st Cir. 1995) (seven-year gap between crime and identification); United States v. Drougas, 748 F.2d 8, 28 (1st Cir. 1984) (five-year gap between crime and photographic identification). Accordingly, we conclude that Robins' time-

based complaint as to the photographic lineup identifications of Patterson and Johnson is without merit.

## IV. Admissibility of Robins' Mugshots

Over Robins' objection, the trial court allowed the State to introduce nine mugshot photographs of him through a police department employee. The State's purpose was to show that Robins was "a man of many hairstyles," attempting to reconcile the differences between witnesses' physical descriptions of the gunman at the time of the shooting and Robins' courtroom appearance. He argues that the photographs were prejudicial in that they allowed the State to present evidence of his prior crimes to the jury in violation of Tennessee Rule of Evidence 404, which sets limits and establishes procedures to be followed before proof of other crimes is admissible.

Before considering this issue, we first will describe the photographs. Each of the nine sets, consisting of a front view and a partial side view, the latter with Robins still facing the camera but with his head turned to the right, shows his face, upper chest, and midpoint of his shoulders. None of the photographs contains numbers or dates identifying them as mugshots, nor does the defendant appear to be wearing jail uniforms in any. The handwritten dates on the backs of the photographs show that they were taken at various times during the period from May 24, 1997, to March 12, 2000. At the trial, Amelia Patterson and Pamela Johnson testified that Robins had his hair pulled back in a ponytail at the time of the killing, which occurred on February 29, 2000. The photographs taken closest to the time of the crime show that as of August 20, 1999, about six months before the crime, he wore his hair in braids. On October 7, 1999, four and a half months before the crime, he was photographed wearing his hair in longer braids, going down to his collar. On December 14, 1999, two and a half months before the crime, his hair was combed back and unkempt, although it is difficult to tell from the photograph whether it then was long enough to wear in a ponytail. On March 12, 2000, two weeks after the offense, a photograph of Robins shows that his hair was very short, possibly grown out slightly after his head had been shaved.

The discretion of the trial judge in allowing the admission of a photograph into evidence will not be overturned except on a clear showing of an abuse of discretion. State v. Lacy, 983 S.W.2d 686, 694 (Tenn. Crim. App. 1997). To be admissible, a photograph must be relevant to some issue at trial, and its probative value must outweigh undue prejudicial effect. Id. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401.

Here, the trial court reviewed the photographs after the arguments of counsel as to their relevance, concluding that they were admissible because of the issue of the length and style of the defendant's hair:

> I think under the circumstances of this case where there is an issue
> about identity, and there has been testimony about Mr. Robins' hair

length, the curls and the like, I think it is legitimate for the State to put this in and I overrule the objection. I don't think the jury is going to take any or draw any great prejudice from this under the circumstances[.]

The defendant maintained that he had been misidentified. The defendant's appearance at trial was apparently different from his appearance at the time of the shooting, according to the State's witnesses' descriptions. Because the photographs of the defendant's past appearance were consistent with the witness testimony as to the gunman's appearance at the time of the shooting, they are relevant to show that the defendant and the gunman are the same person. Further, the trial court found that the photographs passed the Rule 403 balancing test, explaining that identity was a central issue in the case and that the prejudicial effect, if any, would be minimal.

Additionally, the trial court took measures to limit the possibility of the jury's inferring that the defendant had a history of prior arrests. For example, the booking information had been cropped from the bottom of each picture, and the trial court warned that testimony surrounding the introduction of the photographs should be "circumspect" and nothing could be "blurted out" about the photographs actually being mugshots. When the photographs were then introduced through the testimony of a police department employee, no comments were made to directly link the photographs to any kind of past criminal conduct. Additionally, the trial court offered to give a curative instruction contemporaneous to the introduction of the photographs that the jury was "not to infer guilt or any other prior bad conduct from the fact that the police have in their possession photographs." This offer was declined by the defendant. The judge also offered an instruction at the close of trial. It appears that this offer was declined as well.[3] Under Tennessee Rule of Appellate Procedure 36(a), the defendant was under a duty to minimize any harm resulting from the trial court's overruling his objection and required to take "whatever action was reasonably available to prevent or nullify the harmful effect of an error." We conclude that the trial court did not abuse its discretion in allowing these photographs to be utilized at the trial.

### V. Cross-Examination of Detective Satterfield

Pursuant to Tennessee Rule of Evidence 608(b), Robins moved for the trial court's permission to impeach Detective Satterfield using Spurlock v. Satterfield, 167 F.3d 995, 999, 1005 (6th Cir. 1999), an opinion from a civil suit against Detective Satterfield resulting from his participation in a criminal case that was eventually reversed and remanded by this court in State v. Spurlock, 874 S.W.2d 602 (Tenn. Crim. App. 1993). Apparently, the defendant wanted to quote from both opinions as part of his cross-examination although counsel did not specify the specific language which he intended to utilize. He argues that the trial court improperly limited his cross-examination of Detective Satterfield and violated his right to due process by the court's application of Tennessee Rule of Evidence 608(b), which states, in pertinent part:

---

[3] Although the charge conference was not transcribed, the trial judge does state in the record that the parties had no objections to the instructions and no instruction on the photographs was in fact given.

-13-

Specific Instances of Conduct. Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness[.]

The trial court denied the defendant's Rule 608 motion during a jury-out hearing and limited the cross-examination, explaining:

THE COURT: I do believe under Rule 608(b), the defense can ask those three narrow questions that you went over with me with reference to the – you know, just don't leave them open ended. . . . [Y]ou cannot make reference to these Appellate decisions.

MR. RODGERS: So my question should be phrased, just to be perfectly clear because I don't want to get in any difficulty, the question should be phrased, Mr. Satterfield, in the fall of 1990 in Sumner County, did you testify falsely in a trial?

THE COURT: Yes.

MR. RODGERS: And prior to that trial, did you not fabricate evidence?

THE COURT: For use in that trial.

MR. RODGERS: For use in that trial. And did you not manufacture probable cause for use in that trial?

THE COURT: Correct.

MR. RODGERS: Am I on the right track?

THE COURT: Those questions, those three questions you can ask.

MR. RODGERS: Now if he denies doing that, can I ask further?

THE COURT: No.

MR. RODGERS: I am stuck with it.

THE COURT: You are stuck with it. I'm sure – that is discussed – the use of extrinsic evidence is discussed at length in Paine on Evidence and in discussions of the Federal Rules of Evidence, and the decision was made to not allow extrinsic evidence because of a policy decision related to you didn't want to get into the sort of side issue of trying this, and you can see where it could go here. . . . [W]e could [b]e sidetracked here for three hours[.]

During cross-examination, the defendant posed the three narrow questions to Detective Satterfield. To each, the witness responded, "No," and the defendant inquired no further. He argues on appeal that this limitation violated his right to due process.

As referred to by the trial judge, it is explained in Neil P. Cohen et al., Tennessee Law of Evidence, § 6.08[5] (4th ed. 2000), that "[s]pecific instances of conduct under Rule 608(b) may be asked about on cross-examination and the witness's answers must be taken as given." Once the witness has answered the question about the prior incident, further proof is inadmissible as is any extrinsic evidence of the prior bad act. Id. at § 6.08[6][a]; see State v. Shepherd, 862 S.W.2d 557, 571 (Tenn. Crim. App. 1992) (Under Rule 608(b), if the witness denies the conduct, the examiner may not prove the conduct by extrinsic evidence.).

During the arguments as to how far defense counsel would be allowed to go with this line of questioning, the court asked, "[W]hat is he going to testify to in this trial that is so important? He wasn't an eyewitness to this event." Counsel responded that he had been told Detective Satterfield had "[c]oached Amelia Patterson as to her testimony and identification of the defendant," saying he had been told this by the defendant's mother or sister, Nicole House. We note that, although both subsequently testified on behalf of Robins, neither was asked about this claim or testified as to being present at a time when Detective Satterfield was talking with Amelia Patterson. Accordingly, we conclude that the record fully supports the determination of the trial court that Tennessee Rule of Evidence 608(b) prevented Robins' counsel from going beyond the questions which the court allowed of Detective Satterfield's testimony in an earlier unrelated case.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the trial court's judgments.

_____
ALAN E. GLENN, JUDGE

-15-